**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Raven Lavonne Myers,** | : | |
| **Plaintiff,** | : | **Civil Action No.** |
| **v.** | : | |
| **RealPage, Inc. d/b/a LeasingDesk Screening, and LexisNexis Risk Data Management, LLC,** | : | |
| **Defendants.** | : | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action for damages brought by an individual consumer against Defendants RealPage, Inc. d/b/a LeasingDesk Screening ("LeasingDesk") and LexisNexis Risk Data Management, LLC ("LN Risk Data") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA").

## Introduction

1. Raven Lavonne Myers ("Ms. Myers" or "Plaintiff") has never been evicted. Yet in July 2025, LeasingDesk told the apartment community where she had applied that she had been — attributing to her an eviction judgment against a "Robbn Myers," a different person, with a different name, from a different unit, in an eviction case *filed seven months after Ms. Myers had moved out*.

2. Because of LeasingDesk's error, the apartment community denied her application, citing "Eviction unsatisfactory."

3. This was no fluke. LeasingDesk admits in the fine print of its own reports that its eviction results are "generated by a computer matching of name and address(es) only" and that

"false positives" occur. It sells them anyway, because automated matching is cheaper than accuracy.

4. LeasingDesk knows better. In 2018, it paid a $3,000,000 civil penalty and agreed to a federal court order after the Federal Trade Commission charged it with this same kind of loose name matching.

5. LeasingDesk did not act alone. The eviction record came from Defendant LN Risk Data, which collects eviction records about individual consumers, stores them in databases, and sells them to tenant screening companies like LeasingDesk for use in consumer reports. LN Risk Data furnished the "Robbn Myers" eviction for use in Ms. Myers' report and, when she disputed it, failed to investigate as required by the FCRA.

6. The FCRA requires every consumer reporting agency to "follow reasonable procedures to assure maximum possible accuracy" of the information in its reports. 15 U.S.C. § 1681e(b). Neither LeasingDesk nor LN Risk Data did, and Ms. Myers paid the price — a denied rental application, weeks of uncertainty while she fought to clear her name, and the distress of being branded an evicted tenant.

## **Jurisdiction and Venue**

7. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331 and 1337.

8. This Court has personal jurisdiction over LeasingDesk because RealPage is registered to do business in the Commonwealth of Pennsylvania and has thereby consented to the general personal jurisdiction of Pennsylvania courts. See 42 Pa. Cons. Stat. § 5301(a)(2)(i); Mallory v. Norfolk S. Ry. Co., 600 U.S. 122 (2023).

9. This Court has personal jurisdiction over LN Risk Data because LN Risk Data has been registered to do business in the Commonwealth of Pennsylvania as a foreign limited liability company since January 8, 2013, and has thereby consented to the general personal jurisdiction of Pennsylvania courts. See 42 Pa. Cons. Stat. § 5301(a)(3)(i), (b); Mallory, 600 U.S. 122; Webb-Benjamin, LLC v. Int'l Rug Grp., LLC, 192 A.3d 1133 (Pa. Super. 2018). Upon information and belief, LN Risk Data is the entity that furnished the eviction record at issue. Although the LeasingDesk Report identified the vendor by the name of LN Risk Data's predecessor, LexisNexis Risk Data Retrieval Services LLC, that company merged out of existence effective December 31, 2017, and its business is now conducted by LN Risk Data, as described below. LN Risk Data, which is itself registered in Pennsylvania, is therefore the proper defendant.

10. Venue lies properly in this District pursuant to 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because each Defendant is subject to personal jurisdiction in this District and therefore resides in this District for venue purposes.

**Parties**

11. Plaintiff is an adult individual who resides in Leander, Texas.

12. Defendant LeasingDesk is a Delaware corporation with its principal place of business at 2201 Lakeside Blvd., Richardson, Texas 75082. RealPage is registered to do business in the Commonwealth of Pennsylvania and regularly conducts business in the Eastern District of Pennsylvania.

13. Through its LeasingDesk Screening business, RealPage prepares and sells tenant and resident screening reports to landlords and property managers throughout the United States, including in Pennsylvania.

14. Defendant LN Risk Data is a Delaware limited liability company with its principal place of business at 1000 Alderman Drive, Alpharetta, Georgia 30005. LN Risk Data is registered to do business in the Commonwealth of Pennsylvania.

15. LN Risk Data is the successor to LexisNexis Risk Data Retrieval Services LLC ("LNRDRS"), a Georgia limited liability company that merged into LexisNexis Risk Data Management Inc. effective December 31, 2017. Georgia Secretary of State records reflect that LexisNexis Risk Data Management Inc. and LN Risk Data are registered under the same Georgia control number (No. 15063198), and, upon information and belief, LN Risk Data succeeded LNRDRS. In an injunctive relief order entered in 2022 as part of a class settlement to which LN Risk Data was a party, LN Risk Data was defined to include its predecessor entities, "including but not limited to…LexisNexis Risk Data Retrieval Services LLC." Stewart v. LexisNexis Risk Data Retrieval Servs., LLC, No. 3:20-cv-00903-JAG, ECF No. 93, at 2 (E.D. Va. July 27, 2022) (Injunctive Relief Order) (Gibney, J.) (the "Stewart Order").

16. Although LNRDRS ceased to exist in 2017, the July 2025 consumer report at issue identified "LexisNexis Risk Data Retrieval Services LLC" as the vendor of the eviction record. Upon information and belief, LN Risk Data furnished that record and continues to identify its public-record data to customers by the name of its defunct predecessor.

## **Facts**

### **The Purpose of the FCRA**

17. Consumer reports provide information bearing on, among other things, a consumer's credit worthiness, character, general reputation, personal characteristics, and mode of living. Creditors, landlords, and other providers of consumer services use them to make decisions having to do with housing, insurance, employment, credit, and more.

18. Congress understood the dire consequences of inaccurate consumer reporting and enacted the FCRA to "insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

19. To effectuate its goal of accurate reporting, Congress mandated that "[w]henever a consumer reporting agency ("CRA") prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

20. The preservation of one's good name and reputation is also a foundational principle of the FCRA:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)).

21. The FCRA's protections apply with full force to tenant screening reports, which landlords use to decide whether a consumer will be permitted to rent a home. See 15 U.S.C. §§ 1681a(d)(1), 1681b(a)(3)(F)(i).

22. To further its objectives, the FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by a consumer is inaccurate, and to

record the current status of the disputed information or delete it, within 30 days of receiving notice of the dispute. See 15 U.S.C. § 1681i(a)(1)(A).

23. Defendants failed to institute or adhere to policies and procedures that could have prevented the reporting of the inaccurate information described below.

**Tenant Screening Industry Operations**

24. To obtain the data used to create consumer reports, CRAs—including tenant screening companies—utilize data technology that allows the near-instantaneous flow of information, including public court records purchased from third-party record vendors. What would appear to be a benefit of technology, however, has had the opposite effect on many consumers, and has led to the mishandling and misuse of information.

25. LeasingDesk prepares and sells tenant screening reports to landlords and property managers, who use them to determine whether to rent to applicants.

26. LeasingDesk's reports, including the one at issue here, combine credit information obtained from a nationwide CRA (here, Equifax) with public-record information, including records of eviction cases, which LeasingDesk reports under the heading "Suits & Judgments for Eviction, Possession and/or Non-Payment of Rent Report."

27. Upon information and belief, LeasingDesk does not obtain eviction records directly from the courts. As LeasingDesk tells its customers, the eviction information in its reports "is obtained from one or more independent court record collection services and not from any national credit bureau." In Plaintiff's case, that vendor was LN Risk Data, identified in the report by its predecessor's name.

28. The process by which LeasingDesk obtains, matches, and reports eviction records is largely automated.

29. LeasingDesk knows that eviction court records frequently lack unique personal identifiers. As LeasingDesk itself acknowledges to its customers, “Social Security numbers do not appear in the court records and cannot be used to generate Eviction/LLTCR reports.”

30. LeasingDesk nevertheless attributes eviction records to applicants through what it describes as “a computer matching of name and address(es) only.”

31. LeasingDesk knows that its matching method produces errors. It concedes to its customers that “both ‘false positives’ and ‘false negatives’ (missed records) may occur.”

32. Rather than adopting procedures to prevent false positives—such as requiring an exact first-name match, using date of birth where available, comparing the date of the court record against the applicant’s dated address history, matching unit numbers at multi-unit properties, or requiring human review before reporting a record whose identifiers do not match — LeasingDesk shifts the burden of accuracy to its customers through boilerplate fine print instructing them to “take further steps.”

33. LeasingDesk places its business interests above the rights of consumers. It is cheaper for LeasingDesk to produce reports containing inaccurate and incomplete information than to exert proper quality control over those reports before selling them.

34. LeasingDesk wants to maximize the automation of its report-creation process, thereby avoiding the costs of the additional review necessary to identify and remove inaccurate information. To further its own economic ends, LeasingDesk does not employ reasonable procedures to assure that the information it reports relates to the consumer about whom the report is prepared.

35. These incentives are not unique to LeasingDesk. As the Brookings Institution explained, “[w]ith money on the line, you might assume that the credit reporting system would fix

the problem. In reality, it is the opposite. Speed and volume are favored over accuracy. Large-scale inaccuracies are tolerated. The costs of correcting the data outweigh benefits — for the credit bureaus, though, not the consumers…Given the importance of credit scores, why are they so inaccurate? Three reasons: size, speed, and economic incentives of the system." Aaron Klein, The Real Problem with Credit Reports Is the Astounding Number of Errors, Brookings Inst. (Sept. 28, 2017), https://www.brookings.edu/articles/the-real-problem-with-credit-reports-is-the-astounding-number-of-errors/.

36. LeasingDesk knows that landlords and property managers routinely rely on its reports to make leasing decisions without conducting any independent investigation, as the property's management did here.

**Mixed File Problems of the Consumer Reporting Industry**

37. LeasingDesk is well aware that different consumers can have similar names.

38. LeasingDesk also knows that different consumers can share the same or similar addresses—particularly where many unrelated people live, at different times, at the same large apartment complex.

39. LeasingDesk matches public records to a consumer by comparing the information associated with the public record to the information it has about the applicant.

40. Sometimes LeasingDesk's matching algorithms associate information belonging to one consumer with another consumer, resulting in what is commonly known in the industry as a mixed or merged file.

41. A mixed or merged file is the result of inaccurately mixing personal identifying information, public record information, credit information, and/or an entire file belonging to one consumer into the file or report of another consumer. See F.T.C. v. TRW, Inc., 784 F. Supp. 361,

362 (N.D. Tex. 1991) (defining a mixed file as a consumer report "in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report").

42. Mixed files are not new, and LeasingDesk has long known about them. They result from the matching rules a CRA uses to attribute personal identifying and public-record information to a particular consumer, and from the limits of the source data to which those rules are applied.

**The Consumer Reporting Industry's Long History of Mixed Files**

43. CRAs have been on notice for decades of the existence of mixed files and of the fact that their matching procedures are prone to frequent errors. See Thompson v. San Antonio Retail Merchants Ass'n, 682 F.2d 509, 511 (5th Cir. 1982).

44. LeasingDesk has more specific notice. On October 16, 2018, the United States, on behalf of the Federal Trade Commission ("FTC"), filed a complaint and stipulated order against RealPage alleging that it violated Section 1681e(b) of the FCRA by failing to follow reasonable procedures to assure the maximum possible accuracy of its tenant screening reports. See United States v. RealPage, Inc., No. 3:18-cv-02737-N (N.D. Tex.).

45. The FTC alleged that RealPage's automated matching system used overly broad criteria—for example, treating a record for "Antony Jones," "Antonio Jones," or "Antoinette Jones" as a match for an applicant named "Anthony Jones"—and that RealPage lacked procedures to assess the accuracy of those results.

46. To resolve the matter, RealPage paid a $3,000,000 civil penalty—at the time, the largest civil penalty the FTC had obtained against a background screening company—and agreed to a court order requiring it to maintain reasonable procedures to assure the maximum possible accuracy of the information in its consumer reports.

47. Despite that order, LeasingDesk continued to use matching procedures loose enough to attribute an eviction judgment against "Robbn Myers" to an applicant named "Raven Lavonne Myers"—the same kind of partial first-name matching the FTC challenged in 2018.

48. Mixed files create a false description and representation of a consumer's history.

49. RealPage, including through its LeasingDesk business, has been sued repeatedly by consumers alleging violations of the FCRA, including by attributing to them records that belonged to other people. See, e.g., Saylor v. RealPage, Inc., No. 1:22-cv-00053-AJT-IDD (E.D. Va.) (class action alleging RealPage matched sex-offender registry records to rental applicants using a date-of-birth range, even where the registrant's date of birth differed from the applicant's; class settlement and Consent Injunctive Relief Order approved Sept. 26, 2022); Brown v. RealPage, Inc. d/b/a LeasingDesk Screening, No. 4:21-cv-00752 (E.D. Mo. filed June 22, 2021) (alleging LeasingDesk reported the sex-offender and criminal records of a different individual); McIntyre v. RealPage, Inc., 336 F.R.D. 422 (E.D. Pa. 2020) (certifying class under § 1681e(b) alleging RealPage reported eviction records purchased from LexisNexis without their favorable final dispositions), reconsideration denied, 2021 WL 4902329 (E.D. Pa. Oct. 21, 2021), final approval granted, 2023 WL 2643201 (E.D. Pa. Mar. 24, 2023); Kelly v. RealPage Inc., 47 F.4th 202 (3d Cir. 2022) (consumers denied housing based on allegedly inaccurate RealPage reports; FCRA claims for failure to disclose the vendors that supplied the records).

50. Private FCRA lawsuits have resulted in significant settlements and verdicts for consumers who fall victim to mixed files.

51. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." Dalton v. Capital

Associated Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether other consumers lodged similar complaints is relevant to willfulness under the FCRA). Moreover, a CRA that acts in reckless disregard of its statutory duties acts willfully. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57 (2007).

52. Courts of appeals have repeatedly held that a CRA may be found to have willfully violated the FCRA when it attributes another person's records to a consumer. See, e.g., Cortez v. Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010); Williams v. First Advantage LNS Screening Sols., Inc., 947 F.3d 735 (11th Cir. 2020); Dalton, 257 F.3d at 418.

53. Despite federal law, congressional mandate, federal enforcement, a federal court order, and consumer lawsuits, mixed files remain a significant problem for LeasingDesk and for innocent consumers, including Plaintiff.

**LN Risk Data's Business**

54. LN Risk Data collects public records — including eviction records — from courts across the country, directly and through vendors that retrieve records on its behalf. It stores those records in databases it maintains and sells them, for a fee, to CRAs, including tenant screening companies such as LeasingDesk. See Stewart Order at 6 (defining LN Risk Data's databases as those "in which LNRDM stores and transmits data about Public Records to LNRDM's Consumer Reporting Agency Customers").

55. Upon information and belief, LN Risk Data has long supplied the eviction data that appears in RealPage's screening reports. See McIntyre, 336 F.R.D. 422 (class of consumers alleging RealPage reported inaccurate eviction records purchased from LexisNexis for its LeasingDesk and On-Site reports). Here, the LeasingDesk Report identified LN Risk Data, by its predecessor's name, as the "Vendor" of the Eviction.

56. LN Risk Data is a CRA. For monetary fees, it regularly assembles and evaluates information on consumers—eviction records identifying specific individuals by name and address—for the purpose of furnishing consumer reports to third parties, and it uses the internet and other means and facilities of interstate commerce to do so. See 15 U.S.C. § 1681a(f).

57. The eviction records LN Risk Data sells are consumer reports. Each bears on a specific consumer's character, general reputation, personal characteristics, or mode of living, and LN Risk Data furnishes them expecting that they will be used to decide whether that consumer may rent a home. See 15 U.S.C. §§ 1681a(d)(1), 1681b(a)(3)(F)(i). That is the purpose of LN Risk Data's business: under the court order it agreed to, its customers are consumer reporting agencies "contractually permitted to use data supplied by LNRDM regarding Public Records for permissible purposes as defined under the FCRA." Stewart Order at 6.

58. Upon information and belief, LN Risk Data also participates in associating its records with particular rental applicants — by returning records in response to customer searches that contain an applicant's identifying information.

59. LN Risk Data has long known that inaccuracies in its landlord-tenant records harm consumers. In Stewart, a consumer alleged that LN Risk Data's predecessor was a CRA because it sold inaccurate landlord-tenant records to a tenant screening company, causing his rental application to be denied. LN Risk Data resolved that case by agreeing to court-ordered injunctive relief governing its retrieval and reporting of judgment, lien, and landlord-tenant records — relief that remains in effect through as late as June 30, 2029. See Stewart Order at 16.

60. Despite that notice, LN Risk Data made the same mistake as LeasingDesk. It knows that eviction court records often lack Social Security numbers and full dates of birth, and that its customers, including LeasingDesk, attribute its records to applicants by matching names and

addresses alone. Yet it furnishes those records for that purpose without reasonable procedures to prevent misattribution — such as capturing all identifiers available in the court file, flagging records that lack identifiers sufficient for reliable matching, or requiring its customers to match on more than name and address.

61. The result was predictable. LN Risk Data supplied an eviction against "Robbn Myers"—a record with no date of birth, no Social Security number, and a different first name—for use in a report about Raven Myers, and that eviction was reported as hers.

**Case Background**

62. In June 2025, Ms. Myers was preparing to relocate from Huntsville, Texas to the Austin, Texas area and was searching for an apartment.

63. Ms. Myers toured the Broadstone Bryson apartment community, located at 241 S. Chitalpa St., Leander, Texas 78641 (the "Broadstone"), and submitted a rental application hoping to make it her new home.

64. In connection with her application, the Broadstone obtained a tenant screening report about Ms. Myers from LeasingDesk, which LeasingDesk ran on July 1, 2025 (the "LeasingDesk Report").

65. The LeasingDesk Report contained Ms. Myers' full name, date of birth, Social Security number, and driver's license number (each partially masked), as well as her address history — including that she had resided at 2257 Sam Houston Avenue, Apartment 228, in Huntsville, Texas.

66. Under the heading "Suits & Judgments for Eviction, Possession and/or Non-Payment of Rent Report," the LeasingDesk Report listed an eviction case resulting in a "Judgment for Plaintiff" against a defendant named "ROBBN MYERS," at "2257 Sam Houston Apt. APT

410C, Huntsville TX," with the plaintiff identified as "The Armory at Sam Houston," dated March 20, 2024, Case No. 4EV241452, in Walker County, Texas (the "Eviction").

67. The LeasingDesk Report identified the source of the Eviction as "WALKER JP CT 4 - NEW WAVERLY" and identified the vendor as "LexisNexis Risk Data Retrieval Services LLC" — the name of LN Risk Data's predecessor, which had merged out of existence more than seven years earlier.

68. Upon information and belief, Ms. Myers' identifying information — including her name and her address history, which included 2257 Sam Houston Avenue, Huntsville, Texas — was used to search LN Risk Data's records, and LN Risk Data furnished the Eviction for use in the LeasingDesk Report.

69. The Eviction does not belong to Ms. Myers. Ms. Myers has never been evicted.

70. The court record shows that the eviction case, The Armory at Sam Houston v. Robbn Myers, No. 4EV24-1452, was filed in Justice Court, Precinct 4, of Walker County, Texas on March 7, 2024, and that a default judgment of $3,116.00 was entered against "Robbn Myers" on March 20, 2024. The court record contains no date of birth, Social Security number, or other identifier connecting the case to Ms. Myers.

71. Ms. Myers leased a bedroom at The Armory at Sam Houston for a term that ran from August 14, 2022, through July 31, 2023.

72. In August 2023 — approximately seven months before the eviction case was filed — Ms. Myers had moved to a different apartment community in Huntsville, The Connections, where she continued to reside.

73. The Eviction therefore concerns a person with a different first name ("Robbn," not "Raven"), associated with a different unit (410C, not 228), arising from a case filed months after Ms. Myers had moved out of the property.

74. On July 1, 2025, Ms. Myers was notified that her application at the Broadstone was denied. The denial notice, generated through RealPage, listed "Eviction unsatisfactory" as a reason for the denial and identified LeasingDesk Screening as a consumer reporting agency whose report was used.

75. Ms. Myers obtained a copy of the LeasingDesk Report and saw the Eviction.

76. On July 2, 2025, Ms. Myers disputed the Eviction with LeasingDesk and with the Broadstone, providing her leases for The Armory and The Connections, a copy of her driver's license, and the eviction section of the LeasingDesk Report.

77. On July 16, 2025, LeasingDesk notified Ms. Myers that its reinvestigation "revealed that the disputed information is inaccurate, incomplete, or cannot be verified," that it had "determined that this record does not belong to you," and that "the record will be removed from your file."

78. LeasingDesk also advised Ms. Myers that it "reinvestigated the items on your behalf and/or forwarded your dispute and all relevant documentation to the vendor of the record for reinvestigation." The vendor of the record was LN Risk Data. Upon information and belief, LeasingDesk conveyed Ms. Myers' dispute and documentation to LN Risk Data.

79. LeasingDesk was thus able to determine, using readily available information, that the Eviction did not belong to Ms. Myers. Reasonable procedures applied before LeasingDesk sold the LeasingDesk Report would have prevented the error in the first place.

80. Only after LeasingDesk removed the Eviction was Ms. Myers able to move forward with the Broadstone, which pre-approved her application on July 21, 2025 — three weeks after the denial.

81. LeasingDesk later provided Ms. Myers a report dated July 22, 2025, from which the Eviction had been removed.

82. Ms. Myers ultimately leased an apartment at the Broadstone, but only after suffering the denial and weeks of delay and bearing the burden of disproving an eviction that was never hers—all while facing a limited window to secure housing after leaving her prior residence.

83. On July 23, 2025, Ms. Myers also submitted a formal dispute through the LexisNexis online Consumer Dispute Center and by email to LexisNexis, explaining that the Eviction was not hers and attaching her driver's license, both leases, and the eviction section of the LeasingDesk Report.

84. The LexisNexis Consumer Center responded to Ms. Myers' submissions with form auto-replies listing the identity and address "verification documents" it requires to process consumer requests (on July 23, July 24, August 2, and August 7, 2025) — even though she had already provided her driver's license and leases — and, on August 12, 2025, asked her to call.

85. Upon information and belief, the LexisNexis Consumer Center receives and processes consumer disputes on behalf of the LexisNexis Risk Solutions group of companies, including LN Risk Data. LN Risk Data therefore received notice of Ms. Myers' dispute directly, through the LexisNexis Consumer Center, and indirectly, through LeasingDesk.

86. LN Risk Data did not complete a reinvestigation or provide Ms. Myers with the results of any reinvestigation within 30 days of receiving notice of her dispute.

87. On August 28, 2025, Ms. Myers filed a complaint with the Consumer Financial Protection Bureau. On September 12, 2025, LexisNexis Risk Solutions Inc. responded that LexisNexis "did not locate" the Armory judgment record "in the consumer's file with LexisNexis." The response never addressed the eviction record that LN Risk Data had furnished for use in Ms. Myers' tenant screening report, and LexisNexis consumer disclosures dated August 27 and August 31, 2025, likewise did not disclose it.

88. Upon information and belief, LN Risk Data never conducted a reasonable reinvestigation, never reviewed or considered Ms. Myers' documentation, never provided her written notice of results, and has not implemented procedures to prevent the Eviction from again being furnished for use in a consumer report about her. Because, upon information and belief, LN Risk Data continues to collect, store, and sell the Eviction, Ms. Myers lives with the ongoing fear that it will again be attributed to her when she next applies for housing.

89. LeasingDesk should never have reported the Eviction as Ms. Myers'. The information belonged to someone with a similar name and was mixed into Ms. Myers' consumer report.

90. LeasingDesk failed to institute or adhere to policies and procedures that could have prevented the reporting of the inaccurate information. LeasingDesk possessed Ms. Myers' full name, date of birth, Social Security number, and address history. The Eviction record bore a different first name and a different unit number than the Sam Houston Avenue address in Ms. Myers' credit file, and it contained no date of birth or Social Security number. LeasingDesk's own credit data also reported Ms. Myers at a different address—The Connections—beginning in January 2024, before the eviction case was filed. LeasingDesk tells landlords that false positives are less likely where there is a "unique name match and address match." Here there was neither.

Any reasonable procedure—requiring an exact first-name match, matching the unit number, or confirming the match with the applicant, as LeasingDesk itself tells landlords to do—would have prevented the error.

91. LeasingDesk committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking housing by prejudicing prospective landlords with inaccurate information.

92. LeasingDesk knew or should have known that its actions violated the FCRA. LeasingDesk could have taken the steps necessary to bring its practices into compliance with the FCRA but neglected to do so and failed to adequately review those practices to ensure compliance with the law.

93. Plaintiff's consumer report was obtained from LeasingDesk and reviewed by a prospective landlord, and the inaccurate information was a substantial factor in the denial of Plaintiff's rental application and the resulting delay in securing housing. Indeed, the Broadstone approved Ms. Myers' application only after LeasingDesk removed the Eviction, confirming that the Eviction was a substantial factor in the denial.

94. As a result of Defendants' violations of the law, Ms. Myers suffered the denial of a housing opportunity and delay in securing housing, lost time, interference with daily activities, loss of capacity for enjoyment of life, and emotional distress, including, without limitation, emotional and mental anguish, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, fear, worry, anxiety, and embarrassment.

95. At all times pertinent hereto, each Defendant was acting by and through its agents, servants, and/or employees, who were acting within the course and scope of their agency or employment and under the direct supervision and control of that Defendant.

96. At all times pertinent hereto, the conduct of each Defendant, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff.

**Count One – Violation of the FCRA, 15 U.S.C. § 1681e(b)**
**Plaintiff v. LeasingDesk**

97. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

98. At all times pertinent hereto, LeasingDesk was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

99. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

100. At all times pertinent hereto, the LeasingDesk Report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

101. LeasingDesk violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff in the LeasingDesk Report, including by attributing to Plaintiff an eviction judgment belonging to another individual on the basis of loose name-and-address matching.

102. LeasingDesk's violation of 15 U.S.C. § 1681e(b) was willful, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681n. In the alternative, LeasingDesk was negligent, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681o.

103. The conduct of LeasingDesk was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff outlined more fully above and, as a result, LeasingDesk is liable to Plaintiff for the full amount of actual, statutory,

and punitive damages, along with attorneys' fees and the costs of litigation, as well as such further relief as may be permitted by law.

**<u>Count Two – Violation of the FCRA, 15 U.S.C. § 1681e(b)</u>**
**Plaintiff v. LN Risk Data**

104. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

105. At all times pertinent hereto, LN Risk Data was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

106. The information LN Risk Data furnished for use in the LeasingDesk Report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

107. LN Risk Data violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff that it furnished for use in a consumer report, including by furnishing an eviction judgment belonging to another individual for use in Plaintiff's report on the basis of loose name-and-address matching.

108. LN Risk Data's violation was willful, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681n. In the alternative, LN Risk Data was negligent, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681o.

109. LN Risk Data's conduct was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff outlined above, and LN Risk Data is liable to Plaintiff for actual, statutory, and punitive damages, attorneys' fees, and costs.

**<u>Count Three – Violation of the FCRA, 15 U.S.C. § 1681i(a)</u>**
**Plaintiff v. LN Risk Data**

110. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

111. Plaintiff disputed the accuracy of the Eviction and notified LN Risk Data of her dispute directly, through the LexisNexis Consumer Center, and indirectly, through LeasingDesk, a reseller of LN Risk Data's eviction information.

112. The Eviction was contained in Plaintiff's "file" at LN Risk Data within the meaning of 15 U.S.C. § 1681a(g) because, upon information and belief, LN Risk Data recorded and retained the Eviction, together with information identifying the transaction, the customer, and the consumer in connection with whom it was furnished.

113. LN Risk Data violated 15 U.S.C. § 1681i(a) by, among other things, failing to conduct a reasonable reinvestigation within 30 days to determine whether the disputed information was inaccurate; failing to review and consider all relevant information Plaintiff submitted; failing to promptly delete or modify the inaccurate information and to maintain reasonable procedures to prevent its reappearance; and failing to provide Plaintiff written notice of the results of its reinvestigation.

114. LN Risk Data's violations were willful, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681n. In the alternative, LN Risk Data was negligent, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681o.

115. LN Risk Data's conduct was a direct and proximate cause, as well as a substantial factor, in bringing about the actual damages and harm to Plaintiff outlined above, and LN Risk Data is liable to Plaintiff for actual, statutory, and punitive damages, attorneys' fees, and costs.

**Count Four – Violation of the FCRA, 15 U.S.C. § 1681s-2(b)**
**Plaintiff v. LN Risk Data (Pleaded in the Alternative)**

116. Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

117. This Count is pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2). To the extent LN Risk Data is found not to be a consumer reporting agency, it is a person that furnishes information to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2.

118. Upon information and belief, LeasingDesk, a CRA, notified LN Risk Data of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(2), and forwarded "all relevant documentation," including Plaintiff's leases and driver's license.

119. Upon receiving that notice, LN Risk Data was required to conduct an investigation with respect to the disputed information, review all relevant information provided by LeasingDesk, report the results to LeasingDesk, and modify, delete, or permanently block the reporting of information found to be inaccurate, incomplete, or unverifiable. See 15 U.S.C. § 1681s-2(b)(1)(A)–(E).

120. Upon information and belief, LN Risk Data failed to conduct a reasonable investigation and failed to modify, delete, or permanently block its information so that the Eviction would not again be furnished as information pertaining to Plaintiff, in violation of 15 U.S.C. § 1681s-2(b).

121. LN Risk Data's violations were willful, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681n. In the alternative, LN Risk Data was negligent, rendering it liable to Plaintiff pursuant to 15 U.S.C. § 1681o.

**Jury Trial Demand**

122. Plaintiff demands trial by jury on all issues so triable.

**Prayer for Relief**

WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against Defendants, based on the following requested relief:

a. Actual damages;

b. Statutory damages;

c. Punitive damages;

d. Costs and reasonable attorneys' fees; and

e. Such other relief as may be necessary, just and proper.

**THE KIM LAW FIRM, LLC**

BY: *Richard H. Kim* (/s/)
Richard Kim, Esquire
1515 Market St., Suite 1200
Philadelphia, PA 19102
Ph. 855-996-6342 / Fax 855-235-5855
rkim@thekimlawfirmllc.com

*Attorney for Plaintiff Raven Lavonne Myers*

Date: October 16, 2026